IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| J'CARPC, LLC,<br><br>          **Plaintiff,**<br><br>   **v.**<br><br>**DOMINIQUE WILKINS,**<br>**DEXTER CHAPPEL,**<br>**OREL BARCLAY, and**<br>**TOP CHOICE INCORPORATED,**<br><br>          **Defendants.** | **1:06-cv-02357-WSD** |

## <u>OPINION AND ORDER</u>

The matter is before the Court on Plaintiff J'CARPC, LLC's ("Plaintiff")

Motion for Default Judgment against defendant Dexter Chappel ("Chappel") [37]

and Plaintiff's Motion for Default Judgment against defendants Orel Barclay

("Barclay") and Top Choice Incorporated ("Top Choice") [54].

## I.    INTRODUCTION

This action is cast as a dispute between Plaintiff, a New Jersey entertainment

company, and Defendants Dominique Wilkins, Chappel, Barclay, and Top Choice

(collectively, the "Defendants") regarding a commercial arrangement to host

events during the 2003 NBA All-Star game in Atlanta.  The history of the dispute

is set forth in the findings of fact below.  Ordinarily, a default constitutes an admission of the facts alleged in the Complaint.  The Court here is confronted with facts offered, under oath, by Carl Ignacuinos ("Ignacuinos"), a member and president of the Plaintiff, which are materially inconsistent with the facts alleged in the Complaint.[1]  Accordingly, the Court makes findings of fact upon which it bases its conclusions, factual and legal, in deciding the Motions for Default Judgment.

## II.    FINDINGS OF FACT

Ignacuinos is retired from Siemens Medical Systems where he worked in the warehouse in shipping and receiving.  After he left Siemens, he decided to start a company to stage for-profit events.  At the time Ignacuinos formed his company, he had not researched how the event-planning industry worked, had not participated in the planning of sporting, entertainment or other events to make a profit, and had not previously invested in event-planning ventures.

The events at issue in this case were first discussed at a dinner meeting in November 2002, attended by Ignacuinos, defendant Chappel, and defendant

---

[1] For example, Plaintiff alleges in the Complaint that defendant Wilkins made a number of representations to Plaintiff.  The testimony of Plaintiff's president and the only person involved in discussions about the commercial venture at issue in this dispute has testified he never spoke with Wilkins and, in fact, has never met him.

Barclay at Justin's restaurant in New York City.  Ignacuinos did not know either

Chappel or Barclay.  He apparently learned through a friend of a friend that

Chappel and Barclay were planning to stage events at the 2003 NBA All-Star game

in Atlanta.

At the dinner meeting, Barclay claimed to be the representative of defendant

Dominique Wilkins.[2]  The nature and scope of his representation was not discussed

at the meeting, and Ignacuinos did not inquire further about it.  Ignacuinos only

generally understood that Barclay represented Wilkins at least in connection with

events Chappel, Barclay, and Top Choice proposed to sponsor at the 2003 All-Star

game.  Barclay and Chappel told Ignacuinos they intended to host two parties at

which Wilkins, and other celebrities Wilkins invited, would attend.  They stated

that the parties would be filmed for a DVD which would be sold.  They said an

entrance fee would be charged to attend the parties and that "a lot of people were

going to be there," Hr'g Tr. at 23, and it would be a "real festive occasion."  Id. at

25.  Ignacuinos was told he would receive 100% of the "bar tab," 25% of the

proceeds from the DVD sales, and 100% of the admission fees.

---

[2]  Mr. Wilkins then played basketball for the Atlanta Hawks.

No other specific representations were made.  Ignacuinos did not know the entrance fee to be charged, although he thought it was between $120 and $150 dollars.  No estimates of the number of people who were expected to attend was given to him, and the capacity of the rooms in which events would be held apparently was not discussed.  The cost to produce the DVD's was not discussed, nor was the price at which the DVD would be sold, although Ignacuinos recalls someone saying they were going to sell "$500,000 worth."  The specific celebrities who would attend were not stated, except the names Moses Malone and Spud Webb were mentioned as people who were "supposed to be there."  There was no discussion about the "bar tab" or how "bar tab" was defined.  No writing memorialized what was stated at the meeting, and no agreement was later reduced to writing for signature by the parties.

Defendants asked Ignacuinos to contribute approximately $100,000 to fund the events.  Ignacuinos agreed to contribute to the venture because:

> Dominique Wilkins was involved, and I like basketball and I trusted him.  I don't know, I thought it was a good investment.  I liked basketball and I thought it would be, you know, interesting to have all the different events and

> meet people there and stuff and, you know, have a good
> time and make some money.[3]

Hr'g Tr. at 24-25.  Ignacuinos had never met Wilkins, and he gave no basis for

why he trusted him or the other Defendants.  He was not told of the cost to host the

events.

Having agreed to contribute to the events, Ignacuinos electronically

transferred $40,000 from his account to defendant Top Choice, stating that it was

all he was then willing to commit.  Amend. Compl. [2] Exh. C.  He later made

contributions totaling over $50,000 as follows:  $32,000 to a Webster Bank

account controlled by CDC Corporation, and two payments in the amounts of

---

[3] Ignacuinos further explained his decision to participate in this venture:

> I liked basketball, I don't like basketball anymore now,
> but I liked it and I thought it would be interesting to
> invest in it and the party atmosphere and meet the
> celebrities, meet the people, have fun, and then, you
> know, from there build up a company and become a
> renowned name or something where, you know, wow,
> this guy puts on good events or he does different things
> and gets celebrities there, you know.  Hopefully, it would
> advance.  It didn't.  I went the wrong way, I made a
> mistake.

Hr'g Tr. at 61-62.

$9,315.68 and $9,265.68 to Arpin International Group.[4]  Amend. Compl. Exhs. D & E.  There are no allegations or information provided regarding CDC Corporation or Arpin International, except for allegations in the Amended Complaint based on hearsay that the $32,000 payment was transferred to an account for a foundation of which Wilkins was the Chief Executive Officer.  Ignacuinos' contributions totaled $90,581.36.

Ignacuinos traveled to Atlanta for the All-Star game weekend.  While in Atlanta, Ignacuinos apparently elected not to attend either event.  He stated, however, that he was aware one of the events was conducted because another principal of the Plaintiff, Eric Patterson, attended it.[5]  Patterson, however, was present at the event for only part of the time it was held.  Patterson called Ignacuinos from the event to report that the event "wasn't going like it was supposed to," that there was "not as much there as there was supposed to be," and

---

[4]  The ownership of CDC Corporation ("CDC") and Arpin International Group ("Arpin") is unclear.  The relationship, if any, of Chappel, Barclay and Top Choice to CDC and Arpin is equally unclear.

[5]  Patterson did not attend the other event, and it is not known if it was conducted or not.

that the event "wasn't even half full."  Hr'g Tr. at 37-38.[6]  Patterson reported he

did not see any celebrities during the period he attended.  He told Ignacunios he did

not see people being charged at the door.  He did not make any statement about

whether drinks were being consumed or whether the event was being filmed.[7]

Ignacuinos consistently characterized, in his testimony and in Plaintiff's

Second Amended Complaint, his contributions to these events as an "investment."

He has described consistently an arrangement by which whatever money he would

receive was tied to the success of the events.  No pro forma information about the

events, their cost or estimated revenues, or profits was given to him, nor did he ask

for financial information before he made his contributions.  He did not ask Chappel

or Barclay what sort of revenues had been generated by past events, and

Ignacuinos was not even aware of specific events they had put on in the past.

---

[6] Patterson's report is hearsay, but it was offered by Ignacuinos to support
Plaintiff's default judgment motion and is considered by the Court as an admission
that at least one of the events in fact occurred.  Ignacuinos stated he was told at
some point he would get a refund of the money he invested, but only if there was a
"total cancellation" of the events.  Hr'g Tr. at 57.

[7] Plaintiff alleges in the Complaint that a film crew was hired by Barclay
and that the crew traveled to Atlanta to film the events.  Plaintiff alleges that
celebrity interviews were not filmed because the film crew did not receive
permission to film.  The Complaint also alleges arrangements had not been made to
film the events.

Defendants have not paid anything to Ignacuinos in connection with this venture.  Ignacunios does not know for certain what, if any, amount paid by him was tendered to any of the Defendants, except it appears $40,000 was paid to defendants Top Choice and Barclay.  Ignacuinos believes over $50,000 was paid to Wilkins' charitable foundation.

## III.   DISCUSSION

This is a case in which an unsophisticated, naive president of an upstart company was taken advantage of by the Defendants against whom Plaintiff seeks for a default judgment to be entered.  The Court's responsibility is to determine in these circumstances whether a sufficient predicate exists upon which to enter default judgment against defendants Chappel, Barclay and Top Choice.  That determination requires a careful claim-by-claim evaluation.

### A.   The Standard On A Motion For Default Judgment

Rule 55 of the Federal Rules of Civil Procedure vests the Court with discretion to determine whether default judgment should be entered.  Rule 55(b)(2) provides:

> If, in order to enable the court to enter judgment or to
> carry it into effect, it is necessary to take an account or to
> determine the amount of damages or to establish the truth

> of any averment by evidence or to make an investigation
> of any other matter, the court may conduct such hearings
> or order such references as it deems necessary and proper
> . . . .

Fed. R. Civ. P. 55(b)(2).  "In considering a motion for entry of default judgment, a court must investigate the legal sufficiency of the allegations of the plaintiff's complaint."  Bruce v. Wal-Mart Stores, Inc., 699 F. Supp. 905, 906 (N.D. Ga. 1988).  "While defaulting defendants are deemed to have admitted the plaintiff's well-pleaded allegations of fact, default judgment should not be entered unless the plaintiff's claim is legally sufficient."  McCoy v. Johnson, 176 F.R.D. 676, 679 (N.D. Ga. 1997); accord Atlanta Collections, LLC v. Khatib, No. 1:07-CV-0706-JOF, 2007 WL 2757281, at *2 (N.D. Ga. Sept. 18, 2007).

The Court may award damages for default judgment "only if the record adequately reflects the basis for award via a hearing or demonstration by detailed affidavits establishing the necessary facts."  Adolph Coors Co. v. Movement Against Racism and the Klan, 777 F.2d 1538, 1544 (11th Cir. 1985) (internal quotation marks omitted).

The Court finds that it has subject matter jurisdiction in diversity over this case.  See 28 U.S.C. § 1332(a).  Plaintiff is alleged to be a New Jersey limited

liability company.  Defendants are alleged to be citizens of Georgia, Connecticut, and New York.  Plaintiff's claimed amount in controversy exceeds $350,000.

The Court further finds that it has personal jurisdiction over Chappel, Barclay, and Top Choice.  The currently uncontradicted allegations of the Second Amended Complaint state that defendants Chappel, Barclay, and Top Choice, or their representatives, contracted with Plaintiff and then traveled to Atlanta on or around the 2003 NBA All-Star weekend for the purpose of doing business in Georgia.  See O.C.G.A. § 9-10-91(1); Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames, 620 S.E.2d 352, 355 (Ga. 2005) (holding that Georgia courts have "the unlimited authority to exercise personal jurisdiction over any nonresident who transacts any business in this State.").  The Defendants have not contested the Court's jurisdiction over this action or over them personally.

**B.    Plaintiff's Claims For Default Judgment**

Plaintiff's Second Amended Complaint [27] claims breach of contract, unjust enrichment, theft by conversion, quantum meruit, and seeks attorneys fees against all Defendants.  Plaintiff claims fraud in the inducement against Wilkins and Chappel.

### 1.    Breach of Contract

Under Georgia law:  "To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate."  O.C.G.A. § 13-3-1.  "The consent of the parties being essential to a contract, until each has assented to all the terms, there is no binding contract; until assented to, each party may withdraw his bid or proposition."  Id. § 13-3-2.  An action for breach of contract requires breach of a valid contract and resultant damages to the party who has the right to complain about the breach.  Budget Rent-A-Car of Atlanta, Inc. v. Webb, 469 S.E.2d 712, 713 (Ga. Ct. App. 1996).

Plaintiff's breach of contract claim suffers from the fundamental defect that Plaintiff's allegations and testimonial and documentary evidence presented at the hearing on October 24, 2007 fail to show the existence of a valid contract between Plaintiff and Chappel, Barclay, or Top Choice.  Plaintiff's repeatedly characterizes the alleged payments to the Defendants as "investments," and it characterizes Plaintiff as an "investor."  E.g., Second Amended Complaint [27] ¶¶ 13, 16, 18, 19, 22.  During the October 24, 2007 hearing, Ignacuinos, repeatedly referred to the payments made by Plaintiff as investments for which Plaintiff was allegedly

promised a certain return.  E.g., Hr'g Tr. at 21, 23, 24, 29, 42, 43, 56.  The

following exchange is typical of Mr. Ignacuinos' testimony:

> MR. IGNACUINOS:  They mentioned what the
> investment would be, the initial – the investment would
> be, you know, what I had to put in to get involved in
> it to be part of this event.

Id. at 56.

The evidence presented at the hearing and Plaintiff's allegations establish

that there was no enforceable contract.  The parties did not agree on any clear

terms or provisions.  Ignacuinos repeatedly testified that he was unsure what

"terms" the parties allegedly agreed to, including where the parties would be held,

Hr'g Tr. at 29, what would be filmed, id. at 32, how many DVDs would be sold

and at what price, id. at 33-34, how much a ticket to each party would cost, id. at

38, who would attend the parties, id. at 40, how long each party would last, id. at

47, and upon what circumstances would Plaintiff be entitled to a refund of what it

had expended.  Id. at 57.  There is a lack of clear contract terms or any meeting of

the minds.  Id. at 60; O.C.G.A. § 13-3-1.  This lack of an agreement makes it

impossible to determine what, if any, part of the agreement was breached and what

the remedy for a breach should be.  In the absence of an enforceable contract,

Plaintiff's motion for default judgment as to its first claim is denied.

## 2.     Fraud in the Inducement

In Georgia, a cause of action for fraud in the inducement attacks an

underlying transaction or contract as having been deceitful.  Fraud in the

inducement claims do not attack a contract's terms, but rather attack the

circumstances surrounding the making of the contract.  Picken v. Minuteman Press

Int'l, Inc., 854 F. Supp. 909, 911 (N.D. Ga. 1993).

"In Georgia, the common law tort of fraud requires five elements:  (1) false

representation by defendant; (2) with scienter, or knowledge of falsity; (3) with

intent to deceive plaintiff or to induce plaintiff into acting or refraining from

acting; (4) on which plaintiff justifiably relied; (5) with proximate cause of

damages to plaintiff."  Worsham v. Provident Cos., Inc., 249 F. Supp. 2d 1325,

1331 (N.D. Ga. 2002); see also O.C.G.A. §§ 23-2-52, 51-6-2(a).  "The general rule

is that actionable fraud cannot be predicated upon promises to perform some act in

the future.  Nor does actionable fraud result from a mere failure to perform

promises made.  Otherwise, any breach of a contract would amount to fraud."

Buckley v. Turner Heritage Homes, Inc., 547 S.E.2d 373, 376 (Ga. Ct. App. 2001);

accord <u>Goodlett v. Ray Label Corp.</u>, 319 S.E.2d 533, 535 (Ga. Ct. App. 1984).  A

well-recognized exception to this rule is that a promise made without the present

intention to perform can create a cause of action for fraud in the inducement.

<u>Buckley,</u> 547 S.E.2d at 376; <u>Goodlett,</u> 319 S.E.2d at 535; O.C.G.A. § 51-6-2(b).

    The federal rules of pleading further require that, "[i]n all averments of fraud

or mistake, the circumstances constituting fraud or mistake shall be stated with

particularity."  Fed. R. Civ. P. 9(b); <u>accord</u> <u>United States ex rel. Clausen v. Lab.</u>

<u>Corp. of Am., Inc.</u>, 290 F.3d 1301, 1308 (11th Cir. 2002).  Essentially, Rule 9(b)

requires plaintiffs in a fraud case to specify the who, what, where, when, why and

how of the alleged fraud.  <u>Carpenters Health & Welfare Fund v. Coca-Cola Co.</u>,

321 F. Supp. 2d 1342, 1347-48 (N.D. Ga. 2004).

    Plaintiff's allegations and testimony do not sufficiently state a claim for

fraud in the inducement against Chappel, Barclay, or Top Choice.  Although

Plaintiff seeks default judgment for fraud in the inducement against Barclay and

Top Choice, Plaintiff's allegations and testimony do not claim and do not specify

what fraud was allegedly committed.  Plaintiff claims it, along with Barclay,

agreed with defendants Wilkins and Chappel to fund certain events.  <u>See</u> Amend.

Compl. ¶ 9.  Any representations, false or otherwise, made for the purpose of

inducing agreement were made by Chappel and Wilkins, not Barclay and Top Choice.

Plaintiff's fraud in the inducement claim against Chappel suffers from other defects.  A fraud in the inducement claim in Georgia requires that the defendant make a false promise in order to induce agreement and which the defendant does not, at the time of promising, intend to perform.  Plaintiff's allegations and testimony do not satisfy those elements as to defendant Chappel.  Ignacuinos' testimony repeatedly showed that the "terms" of the "agreement" between Plaintiff and Chappel were indefinite.  Ignacuinos did not know how many party-goers were projected to attend the parties, Hr'g Tr. at 25, where the parties would be held, id. at 29, what exactly would be filmed, id. at 32, at what price the party DVDs would be sold, id. at 34, how many DVDs would be sold, id., or how much party-goers would be charged for admission, id. at 38, even though Plaintiff apparently was supposed to receive 100% of the proceeds from ticket sales.  The Court cannot determine what representations made by Chappel were false because Plaintiff is unable to point to any definite representation.  Furthermore, a variety of things that Ignacuinos expected to be performed were in fact performed.  An event – maybe even two events – were held, a film crew was hired, people attended the events

and, presumably, bar beverages were served.  This strongly suggests some intention to meet the representations allegedly made by Chappel.

Plaintiff's allegations and testimony simply also do not establish that Chappel made representations with the present intention not to perform.   The record before the Court does not show that Chappel intended for his representations to be false when made.  It appears instead that the parties planned an investment venture with certain undefined parameters, some of which occurred and some of which went unsatisfied.  The record is not sufficient to support a fraudulent inducement claim.

### 3.    Unjust Enrichment

In the absence of enforceable contract, a plaintiff may be able to recover under a theory of unjust enrichment, claiming a benefit conferred on the defendant for which the plaintiff received no corresponding return.  Ga. Tile Distribs., Inc. v. Zumpano Enters., Inc., 422 S.E.2d 906, 908 (Ga. Ct. App. 1992).  "[U]nder Georgia law, an unjust enrichment claim requires the plaintiff to establish the following: (1) that the plaintiff conferred a benefit on the defendant and (2) that equity requires the defendant to compensate the plaintiff for this benefit."

<u>Chem-Nuclear Sys., Inc. v. Arivec Chems., Inc.</u>, 978 F. Supp. 1105, 1110 (N.D. Ga. 1997); <u>accord</u> O.C.G.A. § 9-2-7.

Plaintiff appears to claim unjust enrichment against Barclay and Top Choice in the amount of $40,000.00, Amend. Compl. ¶ 21, and against Chappel in the amount of $50,581.36. <u>Id.</u> ¶¶ 22-25. The Court agrees Plaintiff conferred a benefit in the amount of $40,000 to Top Choice and that Top Choice benefitted from the receipt of this amount. For these reasons, Plaintiff has an enforceable unjust enrichment claim against Top Choice in the amount of $40,000. As a principal in Top Choice, Barclay was unjustly enriched jointly and severally in the same amount. Similarly, Plaintiff has alleged, albeit barely, that it conferred a benefit upon Chappel by accommodating his alleged instructions to transfer a total of $50,581.36 to accounts which Defendants have not denied were owned by or affiliated with defendant Wilkins. <u>See</u> Amend. Compl. ¶¶ 22-25.[8] Defendant Chappel was thus unjustly enriched by his exercise of control over the $50,581.36

---

[8] Plaintiff admits it does not know what precisely became of the total $50,581.36 in payments. At this stage in the proceedings, however, the Court accepts the uncontradicted allegations of Plaintiff that it transferred those funds at Chappel's direction.

paid by Plaintiff at his direction.  Accordingly, Plaintiff has a valid unjust enrichment claim against Chappel in this amount.

### 4.    Conversion

Georgia law provides that the, "owner of personal property shall be authorized to bring a civil action to recover damages from any person who willfully damages the owner's personal property or who commits a theft as defined in Article 1 of Chapter 8 of Title 16 involving the owner's personal property . . . ." O.C.G.A. § 51-10-6.  Georgia defines criminal theft by conversion as, "when, having lawfully obtained funds or other property of another including, but not limited to, leased or rented personal property, under an agreement or other known legal obligation to make a specified application of such funds or a specified disposition of such property, [a person] knowingly converts the funds or property to his own use in violation of the agreement or legal obligation . . . ."  Id. § 16-8-4(a).

Plaintiff's allegations and testimony simply do not establish that Chappel, Barclay, and Top Choice converted funds from Plaintiff, allegedly under the pretext of agreement, or that they were obligated to make a specific application or disposition of the amounts Plaintiff provided to assist in funding the events.

Plaintiff has been unable to proffer evidence supporting any clear obligations of Chappel, Barclay, or Top Choice which went unsatisfied.  Plaintiff's allegations and Ignacuinos' testimony do not establish that Chappel, Barclay, or Top Choice obtained Plaintiff's funds lawfully and then illegally failed to make a proper disposition of the funds.  Plaintiff does not have a viable conversion claim.

### 5.    Quantum Meruit

Under Georgia law, an action for quantum meruit requires the plaintiff to show (1) performance of services by the plaintiff which are valuable to the defendant; (2) that were either performed at the request of the defendant or knowingly accepted by the defendant; (3) the receipt of which without compensation would be unjust; and (4) plaintiff's expectation of compensation at the time the services were rendered.  Synergy Worldwide, Inc. v. Long, Haymes, Carr, Inc., 44 F. Supp. 2d 1348, 1358 (N.D. Ga. 1998); O.C.G.A. § 9-2-7 ("Ordinarily, when one renders service or transfers property which is valuable to another, which the latter accepts, a promise is implied to pay the reasonable value thereof.").

The record before the Court establishes that Plaintiff invested money with Chappel, Barclay, and Top Choice in the hopes of seeing a return on its

investment.  A failed investment does not establish a claim for quantum meruit under Georgia law.

### 6.  Attorney's Fees

Georgia permits the awarding of attorney's fees, if specially pleaded, where the defendant "has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense . . . ."  O.C.G.A. § 13-6-11.

Chappel, Barclay, and Top Choice have not engaged in conduct that establishes bad faith or stubborn litigiousness.  They simply have not participated in the litigation.  The Court is unaware, and Plaintiff has not provided, any authority for the proposition that failure to answer a complaint constitutes bad faith or stubborn litigiousness under O.C.G.A. § 13-6-11.

## IV.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff J'CARPC, LLC's Motion for Default Judgment against Defendant Dexter Chappel [37] is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's motion for default judgment against defendant Chappel for unjust enrichment is **GRANTED** in the amount of **$50,581.36**.  Plaintiff's default judgment motion against defendant Chappel for

breach of contract, fraud in the inducement, theft by conversion, quantum meruit, and attorney's fees is **DENIED**.

   **IT IS HEREBY FURTHER ORDERED** that Plaintiff J'CARPC, LLC's Motion for Default Judgment against Defendants Orel Barclay and Top Choice Incorporated [54] is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's motion for default judgment against defendants Barclay and Top Choice for unjust enrichment is **GRANTED** in the amount of **$40,000**, to be apportioned jointly and severally.  Plaintiff's default judgment motion against defendants Barclay and Top Choice for breach of contract, fraud in the inducement, theft by conversion, quantum meruit, and attorney's fees is **DENIED**.

   **SO ORDERED** this 5th day of December 2007.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE