IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

J'CARPC, LLC,

                          Plaintiff,

     v.                                      1:06-cv-02357-WSD

DOMINIQUE WILKINS,
DEXTER CHAPPEL,
OREL BARCLAY, and
TOP CHOICE INCORPORATED,

                         Defendants.

## <u>OPINION AND ORDER</u>

The matter is before the Court on defendant Dominique Wilkins'

("Wilkins") Motion for Summary Judgment [66] and on Plaintiff J'CARPC, LLC's

("Plaintiff") Motion for Summary Judgment against Wilkins [69].

## I.   INTRODUCTION

This action is cast as a dispute between Plaintiff, a New Jersey entertainment

company, and Defendants Wilkins, Dexter Chappel, Orel Barclay, and Top Choice

Incorporated (collectively, the "Defendants") regarding a commercial arrangement

to host events during the 2003 NBA All-Star game weekend in Atlanta, Georgia.

Plaintiff claims in essence that it funded approximately $90,000 of the backing for

three celebrity parties during the All-Star weekend, for which Plaintiff alleges it should have been compensated.

## II.    FACTUAL BACKGROUND

Plaintiff's President and managing member, Carl Ignacuinos ("Ignacuinos"), is retired from Siemens Medical Systems where he worked in the warehouse in shipping and receiving.[1]  After he left Siemens, he decided to start a company to stage for-profit events.[2]  At the time Ignacuinos formed his company, he had not researched how the event-planning industry worked, had not participated in the planning of sporting, entertainment or other events to make a profit, and had not previously invested in event-planning ventures.

The events at issue in this case were first discussed at a dinner meeting in November 2002, attended by Ignacuinos, and defendants Chappel and Barclay at Justin's restaurant in New York City.  Ignacuinos did not know either Chappel or

---

[1]  The Court draws its factual summary from the Findings of Fact in the Court's December 5, 2007 Order ("the December Order") and, where cited, the record presented by the parties on summary judgment.

[2]  Plaintiff is a limited liability company formed by Ignacuinos and Eric Patterson in October 2002, primarily to promote parties and other similar events. Def.'s Statement of Material Facts [66] ("DSMF") at ¶ 1; Pl.'s Resp. to Def.'s Statement of Material Facts [74] ("RDSMF") at ¶ 1.

Barclay prior to the meeting.  He apparently learned through a friend of a friend that Chappel and Barclay were planning to stage events at the 2003 NBA All-Star game in Atlanta.

At the dinner meeting, Ignacuinos recalls that Barclay and Chappel claimed to be the representatives of Wilkins, a former professional basketball player and at the time an employee of the Atlanta Hawks NBA franchise.  Deposition of Carl Ignacuinos ("Ignacuinos Dep.") at 22, 25, 26, 37, 97.  The nature and scope of their representation was not discussed at the meeting, and Ignacuinos did not inquire further about it.  Ignacuinos only generally understood that Barclay and Chappel represented Wilkins at least in connection with events Chappel, Barclay, and Top Choice proposed to sponsor at the 2003 All-Star game.[3]  Wilkins asserts that no agency relationship existed between him and Barclay or Chappel.  See Def.'s Statement of Material Facts at ¶ 11.[4]  It is undisputed that the first time Ignacuinos

---

[3]  Barclay filed an Affidavit in 2004.  He does not assert in it that he was Wilkins' agent for the purpose of the events.  See Barclay Aff., Pl.'s Mot. for Summ. J., Exh. D.

[4]  It is telling that during Plaintiff's three-hour deposition of Wilkins, not once did Plaintiff inquire whether Barclay or Chappel represented Wilkins or were acting on his behalf as his agents.

met or communicated with Wilkins was at Wilkins' deposition on August 21, 2007. Ignacuinos Dep. at 18.

Over dinner at Justin's,[5] Barclay and Chappel told Ignacuinos they intended to host two parties at which Wilkins, and other celebrities Wilkins invited, would attend. They stated that the parties would be filmed for a DVD which would be sold. They said an entrance fee would be charged to attend the parties and that "a lot of people were going to be there," Transcript of Hearing held on October 24, 2007 ("Hr'g Tr.") at 23, and it would be a "real festive occasion." Id. at 25. Ignacuinos apparently was told he would receive 100% of the "bar tab," 25% of the proceeds from the DVD sales, and 100% of the admission fees.

No other specific representations were made. Ignacuinos did not know the entrance fee to be charged, although he thought it was between $120 and $150 dollars. No estimates of the number of people who were expected to attend was given to him, and the capacity of the rooms in which events would be held apparently was not discussed. The cost to produce the DVD's was not discussed, nor was the price at which the DVD would be sold, although Ignacuinos recalls

---

[5] The Justin's Restaurant meeting was the first and only time Ignacuinos met with Barclay and Chappel.

someone saying they were going to sell "$500,000 worth." The specific celebrities who would attend were not stated, except the names Moses Malone and Spud Webb were mentioned as people who were "supposed to be there." There was no discussion about the "bar tab" or how "bar tab" was defined. Ignacuinos was not shown any documents by Barclay or Chappel, no writing memorialized what was stated at the meeting, and no agreement was later reduced to writing for review or signature by the parties. DSMF ¶ 10; RDSMF ¶ 10.

Barclay and Chappel asked Ignacuinos to contribute approximately $100,000 to fund the events. Ignacuinos agreed to contribute to the venture because:

> Dominique Wilkins was involved, and I like basketball and I trusted him. I don't know, I thought it was a good investment. I liked basketball and I thought it would be, you know, interesting to have all the different events and meet people there and stuff and, you know, have a good time and make some money.

Hr'g Tr. at 24-25. Having never met Wilkins, Ignacuinos stated no basis for why he trusted Wilkins or the other Defendants.

Ignacuinos agreed to contribute to the events and made the following transfers of his personal funds: on November 29, 2002, Ignacuinos, acting on the

direction of Chappel, electronically transferred $40,000 from his account to

defendant Top Choice, DSMF ¶ 21; RDSMF ¶ 21, on December 18, 2002, Chappel

instructed Ignacuinos to transfer approximately $18,000 to Arpin International

Group ("Arpin"), and Ignacuinos complied with Chappel's instructions by

charging $9,315.68 to his American Express card on each of December 18, 2002

and December 19, 2002 and transferring those funds to Arpin, DSMF ¶¶ 25-26,

RDSMF ¶¶ 25-26, and finally, again as directed by Chappel, Ignacuinos

transferred $32,000 from his account to a Webster Bank account held in the name

of CDC Corporation ("CDC"), DSMF ¶ 31, RDSMF ¶ 31.  Ignacuinos'

contributions totaled $90,581.36.  At the time of transfer, Ignacuinos was aware

that Top Choice was a company owned by Barclay and in which Wilkins had no

ownership interest.  DSMF ¶¶ 22-23, RDSMF ¶¶ 22-23.  Ignacuinos was also

aware that Chappel was affiliated with Arpin and that Wilkins was not.  DSMF ¶

27, RDSMF ¶ 27, Ignacuinos Dep. at 30.[6]  Ignacuinos was aware that Wilkins was

not affiliated with CDC.  DSMF ¶ 32, RDSMF ¶ 32.[7]

On November 24, 2002, Wilkins and Barclay signed a letter purporting to

grant Barclay access and filming privileges to events sponsored by Wilkins and

Top Choice during the All-Star weekend.  On November 27, 2002, Barclay, on

behalf of Top Choice, signed an Independent Services Agreement with The

Dominique Wilkins Foundation, Inc. (the "Foundation"), a charitable foundation

established by Wilkins, Wilkins Dep. at 10, in which Top Choice agreed to plan

and fund two events during the All-Star weekend and obligating Top Choice to pay

$70,000 to the Foundation.  Wilkins Dep., Exh. 9.  On January 21, 2003, Barclay

and Wilkins signed a Letter of Intent in which Barclay agreed to pay $50,000 to the

Foundation in exchange for a percentage of the proceeds of the events sponsored

---

[6]  Plaintiff argues that a material fact exists over what Plaintiff knew regarding Arpin's ownership.  Having examined Ignacuinos' testimony, the Court determines that Ignacuinos did not have reason to believe Wilkins had any interest in Arpin, and there is no evidence in the record suggesting Wilkins had an interest in Arpin.  Ignacuinos was only aware that Chappel was affiliated with Arpin.

[7]  It is undisputed that the funds underlying this dispute were transferred from accounts held by Ignacuinos and that the funds never traveled through an account owned by Plaintiff.  DSMF ¶ 35, RDSMF ¶ 35.  Plaintiff alleges that Ignacuinos loaned the funds to it.

by the Foundation during the All-Star weekend, including exclusive film rights. Id. Exh. 10. The Letter of Intent required that the funds be transferred to the Foundation by January 22, 2003. Messrs. Barclay and Wilkins also signed another undated Letter of Intent granting Barclay fifty percent (50%) of the profits earned at an event to be held at Club eleven50 on February 6, 2003. Id. Exh. 11. The agreement and letters of intent do not mention Plaintiff or Ignacuinos.

On January 22, 2003, Wilkins received two payments of $25,000 each, one from Top Choice and one from an entity known as Travio Records Inc. Ignacuinos Dep., Exh. 8 (Exhs. C & D). Plaintiff disputes that the transfer from Travio Records occurred. There is, however, no evidence in the record to support Plaintiff's contention. It is undisputed that Plaintiff does not have an ownership interest in either Top Choice or Travio Records. DSMF ¶ 38, RDSMF ¶ 38.

Ignacuinos traveled to Atlanta for the All-Star game weekend, February 6-9, 2003. During the weekend, Wilkins hosted three events: an All-Star bowling event at the AMF Bowling Alley in Chamblee, Georgia, a "Double Dunk" party at a venue called Club eleven50, and an All-Star closing party at Mumbo Jumbo's. Wilkins Dep. at 21-22. While in Atlanta, Ignacuinos apparently elected not to attend any event. He stated, however, that he was aware one of the events was

conducted at an unknown location because another principal of the Plaintiff,
Eric Patterson, attended it.  Patterson, however, was present at the event for only
part of the time it was held.  Patterson called Ignacuinos from the event to report
that the event "wasn't going like it was supposed to," that there was "not as much
there as there was supposed to be," and that the event "wasn't even half full."  Hr'g
Tr. at 37-38.[8]  Patterson reported he did not see any celebrities during the period he
attended.  He told Ignacuinos he did not see people being charged at the door.[9]  He
did not make any statement about whether drinks were being consumed or whether
the event was being filmed.

     Ignacuinos consistently characterized, in his testimony and in Plaintiff's
Second Amended Complaint, his contributions to these events as an "investment."
He has consistently described an arrangement by which whatever money he would
receive was tied to the success of the events.  No pro forma information about the

---

[8] Patterson's report is hearsay, but it was offered by Ignacuinos to support
Plaintiff's default judgment motion and is considered by the Court as an admission
that at least one of the events in fact occurred.  Ignacuinos stated he was told at
some point he would get a refund of the money he invested, but only if there was a
"total cancellation" of the events.  Hr'g Tr. at 57.

[9] Wilkins testified that Foundation requested a $50.00 donation from
attendees at the bowling event and that an admission fee of $60.00 was charged for
the parties held at Club eleven50 and Mumbo Jumbo.  Wilkins Dep. at 23, 30.

events, their cost or estimated revenues, or profits was given to him, nor did he ask for financial information before he made his contributions.  He did not ask Chappel or Barclay what sort of revenues had been generated by past events, and Ignacuinos was not even aware of specific events they had put on in the past. DSMF ¶ 14, RDSMF ¶ 14.

The Defendants have not repaid any of Plaintiff's contributions, and Plaintiff has not received any return on its investments in these ventures.  On October 2, 2006, Ignacuinos filed this action, later amending the complaint to assert causes of action on behalf of Plaintiff.

Defendants Barclay, Chappel, and Top Choice have not appeared in this action.  On December 5, 2007, the Court entered default judgment against Barclay, Chappel, and Top Choice on Plaintiff's unjust enrichment claim.  The Court awarded as damages the full amounts transferred by Ignacuinos to defendants Barclay, Chappel, and Top Choice.

## III.   DISCUSSION

This is a case in which an unsophisticated, naive president of an upstart company apparently was taken advantage of by two individuals whom he had never met and who convinced him to invest nearly $100,000 in risky, speculative

events.  The Court has already entered judgment against those individuals.  The Court now must determine if Wilkins should be held liable as Barclay's and Chappel's principal.

### A.   The Standard On A Motion For Summary Judgment

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999). "The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 127 S. Ct. 1769, 1776 (2007).  Where the record tells two

different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment.  Id. "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment is proper.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

   **B.**   **The Law of Agency**

   Whether Wilkins should be held liable to Plaintiff centers on whether Chappel or Barclay acted as Wilkins' agent during their dealings with Ignacuinos. On the basis of a single discussion with two individuals he had never met and knew nearly nothing about, Ignacuinos caused Plaintiff to enter into a commercial arrangement.  Plaintiff now seeks to hold liable a person Ignacuinos had not met until over four years after that meeting, solely on the basis of unsubstantiated assertions made to Ignacuinos by Chappel and Barclay.

"In order that acts of an agent be binding on his alleged principal, a principal and agent relationship must be proved and it must be established that [the] agent acted within [the] scope of [his] authority." <u>Anaya v. Coello</u>, 279 Ga. App. 578, 580 (2006).  Under Georgia law, an agency relationship can arise in three distinct ways: expressly, by implication, or through subsequent ratification by the principal of the agent's conduct.  O.C.G.A. § 10-6-1.

Express agency arises in the situation where the principal expressly confers authority on the agent to act on its behalf.  In absence of express authority, the Court may look to whether agency is implied by the circumstances.  <u>Hinley v. Barrow</u>, 169 Ga. App. 529, 530 (1984).  The agency relationship cannot be proved solely by the testimony of the alleged agent, but the Court may "look to the testimony to see whether or not there are any other circumstances which, when coupled with this declaration of the alleged agent, would be sufficient to clothe [the agent] with authority to bind [the principal]." <u>Richie & Co. v. Cohen</u>, 14 S.E.2d 603, 606 (Ga. App. 1941).  Agency may arise by implication due to the apparent authority of an agent, even if the agent has no actual authority, but only due to the conduct of the *principal* vis-a-vis the third-party.  <u>Hinley</u>, 169 Ga. App. at 530 ("Agency may result where one party has apparent authority to affect the legal

relations of another party by transactions with a third party, but it must be
emphasized that apparent authority to do an act is created as to a third person when
the statements or conduct of the alleged principal reasonably cause the third person
to believe that the principal consents to have the act done on his behalf by the
purported agent.  Where the only evidence that a person is an agent of another
party is the mere assumption that such agency existed, or an inference drawn from
the actions of that person that he was an agent of another party, such evidence has
no probative value and is insufficient to authorize a finding that such an agency
exists.") (internal citations and quotation marks omitted).

Plaintiff has not identified any evidence that Wilkins expressly authorized
either Chappel or Barclay to act on his behalf.

As for implied agency, there is no evidence to support that either Barclay or
Chappel were acting as Wilkins' agents.  While Ignacuinos refers to
communications in which Barclay and Chappel claimed to be representatives of
some sort of Wilkins, these statements cannot independently establish an agency
relationship.  Barclay stated in his Affidavit that Wilkins knew "that [he] would be
getting other investors from the East coast area."  Barclay Aff. at ¶ 13.  Plaintiff
argues that Barclay's statement that Wilkins knew other investors were being

recruited is sufficient to show an implied agency between Wilkins and Barclay or Chappel.  Even assuming that the "other investors" statement shows an agency relationship (and the evidence shows only that Wilkins may have known that Barclay might seek other investors to fund this business venture), Plaintiff must have relied on some action of Wilkins before an implied agency relationship can exist.  It is undisputed that Wilkins did not meet or speak with Ignacuinos until four years after the 2003 All-Star Game and not before Ignacuinos filed suit.  An implied agency relationship cannot arise in the absence of action by the principal.

An agency relationship can also be created by ratification, when a principal "subsequently ratifies the acts of another in his behalf."  <u>Ellis v. Fuller</u>, 282 Ga. App. 307, 309 (2006) (internal quotation marks omitted).  "'For ratification to be effective, the principal must know of the agent's unauthorized act and, with full knowledge of all the material facts, accept and retain the benefits of the unauthorized act.'" <u>Holy Fellowship Church of God in Christ v. Brittain</u>, 240 Ga. App. 436, 437 (1999) (quoting <u>Bresnahan v. Lighthouse Mission</u>, 230 Ga. App. 389, 392 (1998)); <u>accord</u>; <u>Synergy Worldwide, Inc. v. Long, Haymes, Carr, Inc.</u>, 44 F. Supp. 2d 1348, 1356 (N.D. Ga. 1998).

The evidence in the record establishes that Wilkins received a total of $50,000 from accounts affiliated with Barclay and Chappel. There is no evidence in the record that Wilkins had any reason to believe those funds originated from Plaintiff or anyone other than Barclay and Chappel. There is no evidence that Wilkins had any knowledge of Plaintiff or Ignacuinos' involvement in this matter until suit was filed. There is no evidence that any amount received by Wilkins included any funds invested by Plaintiff or Ignacuinos. The evidence in the record shows that Wilkins did not know and not even heard of Plaintiff or Ignacuinos. Wilkins simply could not have ratified the acts constituting an agency relationship upon which Plaintiff might rely in this action.

The undisputed evidence does not, as a matter of law, support that either Barclay or Chappel acted as Wilkins' agent in dealings with Plaintiff or Ignacuinos.[10] There simply is no evidence, direct or circumstantial, that either

---

[10] Plaintiff argues that Wilkins admits that a question of fact exists regarding the agency relationships because of this statement in Wilkins' brief for summary judgment: "In this case, a bona fide controversy (at minimum) exists as to whether an oral contract existed and was breached; whether there was an agency relationship between Mr. Wilkins and Defendants Chappel or Barclay; whether Mr. Wilkins received any of Plaintiff's money; and whether Plaintiff is even the proper party to bring such claims." Def.'s Br. in Support of Summ. J. at 24. The Court disagrees. When read in context, that sentence was part of Wilkins' argument for why he had not acted with bad faith or stubborn litigiousness in this case. A "bona

Barclay or Chappel had actual or apparent authority to act on Wilkins' behalf in any commercial dealings with Plaintiff or Ignacuinos, and there is no evidence that Wilkins ratified any representations made by Barclay or Chappel.

### C.   <u>Plaintiff's Claims Against Wilkins</u>

Plaintiff's Second Amended Complaint [27] claims breach of contract, unjust enrichment, theft by conversion, quantum meruit, and seeks attorneys fees against all Defendants.  Plaintiff claims fraud in the inducement against Wilkins and Chappel.  Based on a single discussion with people who were not Wilkins' agents, Plaintiff has asserted six theories of recovery against a man he never met. This Order addresses each of the claims Plaintiff has cobbled together through speculation and conjecture based on little factual predicate.

### 1.   **Breach of Contract**

Under Georgia law:  "To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate."  O.C.G.A. § 13-3-1.  "The consent of the parties being essential to a

_____

fide controversy" between the parties on an issue in the case is not the same as a genuine question of material fact sufficient to preclude summary judgment.

contract, until each has assented to all the terms, there is no binding contract; until

assented to, each party may withdraw his bid or proposition." Id. § 13-3-2.  An

action for breach of contract requires breach of a valid contract and resultant

damages to the party who has the right to complain about the breach.  Budget

Rent-A-Car of Atlanta, Inc. v. Webb, 469 S.E.2d 712, 713 (Ga. Ct. App. 1996).

Plaintiff's managing member, Ignacuinos, admitted that he had never

contracted orally or in writing directly with Wilkins.  Ignacuinos Dep. at 76-77.

To the extent any contract bound Plaintiff and Wilkins, it would have had to be

formed through the agency of Barclay or Chappel.  The Court has already

determined that neither Barclay nor Chappel acted as Wilkins' agent.  For that

reason alone, Plaintiff' breach of contract claim fails against Wilkins.

Plaintiff's breach of contract claim also fails because the undisputed

evidence in the record shows that there was no valid contract between Plaintiff and

Chappel, Barclay, or Top Choice.  Plaintiff repeatedly characterizes the alleged

payments to the Defendants as "investments," and it characterizes Plaintiff as an

"investor."  E.g., Second Amended Complaint [27] ¶¶ 13, 16, 18, 19, 22.  During

the October 24, 2007 hearing, Ignacuinos repeatedly referred to the payments made

by Plaintiff as investments for which Plaintiff was allegedly promised a certain

return.  E.g., Hr'g Tr. at 21, 23, 24, 29, 42, 43, 56.  Ignacuinos repeatedly testified

that he was unsure what "terms" the parties allegedly agreed to, including where

the parties would be held, Hr'g Tr. at 29, what would be filmed, id. at 32, how

many DVDs would be sold and at what price, id. at 33-34, how much a ticket to

each party would cost, id. at 38, who would attend the parties, id. at 40, how long

each party would last, id. at 47, and upon what circumstances would Plaintiff be

entitled to a refund of what it had expended.  Id. at 57.  There is a lack of clear

contract terms or any meeting of the minds.  Id. at 60; O.C.G.A. § 13-3-1.  This

lack of an agreement makes it impossible to determine what, if any, part of the

agreement was breached and what the remedy for a breach should be.[11]  Wilkins is

entitled to summary judgment on the breach of contract claim.

## 2.    Fraud in the Inducement

In Georgia, a cause of action for fraud in the inducement attacks an

underlying transaction or contract as having been deceitful.  Fraud in the

inducement claims do not attack a contract's terms, but rather attack the

---

[11]  Even if there were a valid contract here, the dearth of evidence on what
damages Plaintiff should receive make it inconceivable that the Court could grant
summary judgment for the Plaintiff on the breach of contract claim.  Ignacuinos
could not even begin to identify, beyond utter speculation, what sort of return he
expected to receive for his investments.

circumstances surrounding the making of the contract.  Picken v. Minuteman Press Int'l, Inc., 854 F. Supp. 909, 911 (N.D. Ga. 1993).

"In Georgia, the common law tort of fraud requires five elements:  (1) false representation by defendant; (2) with scienter, or knowledge of falsity; (3) with intent to deceive plaintiff or to induce plaintiff into acting or refraining from acting; (4) on which plaintiff justifiably relied; (5) with proximate cause of damages to plaintiff."  Worsham v. Provident Cos., Inc., 249 F. Supp. 2d 1325, 1331 (N.D. Ga. 2002); see also O.C.G.A. §§ 23-2-52, 51-6-2(a).  "The general rule is that actionable fraud cannot be predicated upon promises to perform some act in the future.  Nor does actionable fraud result from a mere failure to perform promises made.  Otherwise, any breach of a contract would amount to fraud." Buckley v. Turner Heritage Homes, Inc., 547 S.E.2d 373, 376 (Ga. Ct. App. 2001); accord Goodlett v. Ray Label Corp., 319 S.E.2d 533, 535 (Ga. Ct. App. 1984).  A well-recognized exception to this rule is that a promise made without the present intention to perform can create a cause of action for fraud in the inducement. Buckley, 547 S.E.2d at 376; Goodlett, 319 S.E.2d at 535; O.C.G.A. § 51-6-2(b).

Plaintiff's allegations and testimony do not support a claim for fraud in the inducement against Wilkins.  The evidence in the record establishes that Wilkins

-20-

did not make any representations to Plaintiff or Ignacuinos and that any

representations Chappel or Barclay made were not authorized or ratified by

Wilkins.  Wilkins cannot be liable for representations he did not make or authorize.

Even if Wilkins had formed an agency relationship with Chappel or Barclay, their

alleged misrepresentations are not actionable as fraud.  Plaintiff alleges that

Chappel or Barclay misrepresented to Plaintiff that his investment was

"guaranteed."  Ignacuinos testified, however, that he understood he would be

entitled to a refund of his money only if there was a "total cancellation" of the

events.  Hr'g Tr. at 57.  It is undisputed that three events were held and that at least

some money was collected at those events.  Plaintiff also asserts that Wilkins,

through Chappel or Barclay, misrepresented that Plaintiff's investments would go

to the Foundation, rather than to Wilkins personally.  Even if this representation

were made, that fact is not material to Plaintiff's decision to invest.

### 3.    Unjust Enrichment

In the absence of an enforceable contract, a plaintiff may be able to recover

under a theory of unjust enrichment, claiming a benefit conferred on the defendant

for which the plaintiff received no corresponding return.  Ga. Tile Distribs., Inc. v.

Zumpano Enters., Inc., 422 S.E.2d 906, 908 (Ga. Ct. App. 1992).  "[U]nder

Georgia law, an unjust enrichment claim requires the plaintiff to establish the following: (1) that the plaintiff conferred a benefit on the defendant and (2) that equity requires the defendant to compensate the plaintiff for this benefit." Chem-Nuclear Sys., Inc. v. Arivec Chems., Inc., 978 F. Supp. 1105, 1110 (N.D. Ga. 1997); accord O.C.G.A. § 9-2-7.

Plaintiff appears to claim unjust enrichment in the total amount of $90,581.36 against Wilkins.  The Court agrees that Plaintiff conferred a benefit in the amount of $40,000 to Top Choice and that Top Choice benefitted from the receipt of this amount.  Similarly, Plaintiff has shown that it conferred a benefit upon Chappel by accommodating his alleged instructions to transfer a total of $50,581.36 to accounts controlled by or affiliated with him.  The only transfers shown to Wilkins, however, were two transfers, totaling $50,000, made from entities entirely unaffiliated with Plaintiff.  There is no evidence that any portion of these transfers included moneys invested by Plaintiff.  Plaintiff cannot claim unjust enrichment unless it can show that it conferred a benefit upon the defendant.  There is no evidence to support an unjust enrichment claim against Wilkins.

### 4.    Conversion

"Under Georgia law a conversion is the unauthorized assumption and exercise of the right of ownership over personal property belonging to another which is contrary to the owner's right." <u>Swish Mfg. Se. v. Manhattan Fire & Marine Ins. Co.</u>, 675 F.2d 1218, 1219 (11th Cir. 1982) (internal quotation marks omitted); <u>accord</u> <u>Decatur Auto Center v. Wachovia Bank, N.A.</u>, 276 Ga. 817, 819 (2003). Plaintiff's conversion claim against Wilkins fails because Plaintiff has not produced any evidence showing that Wilkins received Plaintiff's funds. The only two transfers to Wilkins came from defendant Top Choice and a third-party record company, neither of which are affiliated with or owned by Plaintiff or Ignacuinos. Ignacuinos admitted during his deposition that those two transfers to Wilkins are the only transfers at issue in this case. Ignacuinos Dep. at 46. The evidence in the record shows that Wilkins did not receive any funds from Plaintiff and therefore he cannot be liable for conversion.

### 5.   Quantum Meruit

Under Georgia law, an action for quantum meruit requires the plaintiff to show (1) performance of services by the plaintiff which are valuable to the defendant; (2) that were either performed at the request of the defendant or knowingly accepted by the defendant; (3) the receipt of which without

-23-

compensation would be unjust; and (4) plaintiff's expectation of compensation at the time the services were rendered.  Synergy Worldwide, 44 F. Supp. 2d at 1358; O.C.G.A. § 9-2-7 ("Ordinarily, when one renders service or transfers property which is valuable to another, which the latter accepts, a promise is implied to pay the reasonable value thereof.").

The record before the Court establishes that Plaintiff invested money with Chappel, Barclay, and Top Choice in the hopes of seeing a return on its investment.  A failed investment does not establish a claim for quantum meruit under Georgia law.  Plaintiff also does not allege that it performed any services for Wilkins, or that Wilkins even knew of Plaintiff's existence until after Ignacuinos filed suit.  There is no evidence to support Plaintiff's quantum meruit claim against Wilkins.

### 6.    Attorney's Fees

Georgia permits the awarding of attorney's fees, if specially pleaded, where the defendant "has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense . . . ."  O.C.G.A. § 13-6-11.  Wilkins has prevailed on all the claims asserted against him.  There is no evidence to support an award of attorneys fees.

**IV.   CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Dominique Wilkins' Motion for Summary Judgment [66] is **GRANTED**.

**IT IS HEREBY FURTHER ORDERED** that Plaintiff J'CARPC, LLC's Motion for Summary Judgment Against Defendant Dominique Wilkins [69] is **DENIED**.

The Clerk is instructed to dismiss Defendant Wilkins from this action.

**SO ORDERED** this 29th day of February 2008.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE